# EXHIBIT 1

Electronically FILED by Superior Court of California, County of Los Angeles on 04/27/2020 12:00 AM Sherri R. Carter, Executive Officer/Clerk of Court, by C. Monroe,Deputy Clerk
Case 2:20-cv-07036-SVW-AGR   Document 1-1   Filed 08/05/20   Page 2 of 55   Page ID #:7
Assigned for all purposes to: Stanley Mosk Courthouse, Judicial Officer: Robert Draper

1    Raymond N. Haynes, Jr
      Attorney at Law
2    SBN: 93852
      9060 Grove Street
3    Elk Grove, CA 95624

4

5    ATTORNEYS FOR CALPRO,
      ANTON KARRAA, RABADI SERVICE
      STATION, INC., J. KEITH STEPHENS, AND
6    VIRTUAL MEDIA GROUP, INC.

7

8            **SUPERIOR COURT OF THE STATE OF CALIFORNIA**

9                  **COUNTY OF LOS ANGELES**

10

| | |
|---|---|
| 11 | **COMPLAINT FOR:** |
| | 20STCV15924 |
| 12  ANTON KARRAA, RABADI | **1. DEPRIVATION OF CIVIL** |
|       SERVICE STATION, INC. | **RIGHTS - FIRST AMENDMENT** |
| 13  CALPRO, an Unincorporated | **[42 USC 1983];** |
|       Association of Residents, Property | |
| 14  Owners and Taxpayers of the City of | **2. DEPRIVATION OF CIVIL** |
|       Los Angeles, J. KEITH STEPHENS, | **RIGHTS - FIFTH AMENDMENT** |
| 15  and VIRTUAL MEDIA GROUP, | **[42 USC 1983];** |
|       INC., | |
| 16 | **3. EMINENT DOMAIN;** |
|           Plaintiffs, | |
| 17 | **4. VIOLATION OF THE SHERMAN** |
| | **ANTITRUST ACT;** |
| 18 | |
|         vs. | **5. VIOLATION OF THE** |
| 19 | **CARTWRIGHT ACT;** |
| 20  CITY OF LOS ANGELES, a municipal | **6. VIOLATION OF CALIFORNIA** |
|       corporation, OUTFRONT MEDIA, | **UNFRONT COMPETITION LAW;** |
| 21  INC., and DOE 1 through DOE 25, | **AND** |
| 22      Defendants. | **7. WRIT OF MANDATE** |
| 23 | |
| | **[DEMAND FOR JURY TRIAL]** |
| 24 | |

25

26

27

28

                                                  **COMPLAINT**

Plaintiffs allege as follows:

# I. THE PARTIES

## A. Plaintiffs

1.     Plaintiff, The California Property Rights Organization of Los Angeles ("CALPRO"), is an unincorporated association of residents, property owners and taxpayers in the City of Los Angeles (the "City"). The majority of CALPRO's members have paid taxes to the City within one year before the commencement of this action.[1]  CALPRO sues herein individually and in a representative capacity on behalf of the City and its residents, property owners and taxpayers.

2.     Plaintiff, Anton Karraa ("Karraa") is a member of CALPRO and a resident, property owner and taxpayer in the City. Karraa has paid taxes to the City within one year before the commencement of this action.

3.     Karraa is also the President of Rabadi Service Station, Inc., a California corporation which owns and operates a Mobile gas station located at 6301 Santa Monica Boulevard in the City (hereafter the "Service Station Property").

4.     Until on or about September 1, 2019, Outfront Media, Inc. ("Outfront), operated an off-site advertising sign ("Billboard") at the Service Station Property

---

[1]     Section 526a of the California Code of Civil Procedure creates special standing for taxpayers to bring suit to prevent certain government actions:

> An action to obtain a judgment, restraining and preventing any illegal expenditure of, waste of, or injury to, the estate, funds, or other property of a county, town, city or city and county of the state, may be maintained against any officer thereof, or any agent, or other person, acting in its behalf, either by a citizen resident therein, or by a corporation, who is assessed for and is liable to pay, or, within one year before the commencement of the action, has paid, a tax therein. [Emphasis added.]

> In addition to the rights created by section 526a, the common law also empowers taxpayers to sue the government on grounds of fraud, collusion, ultra vires, or a failure to perform a duty specifically enjoined. (*San Bernardino County v. Superior Court* (2015) 239 Cal.App.4th 679, 681 [190 Cal.Rptr.3d 876].)

**COMPLAINT**

pursuant to a written lease. The aboveground portions of this Billboard have been removed by Outfront, but all of the below ground portions of the Billboard, including its support column and foundation remain in place. Additionally, Outfront still operates a second Billboard on the Service Station Property.

5.     Plaintiff, J. Keith Stephens is an individual residing in the City and has worked in the outdoor adverting Industry in Sothern California, including in the City, developing and operating Billboards for more than three decades in the City and surrounding areas.[2]

6.     Plaintiff, Virtual Media Group, Inc. ("VMG") is an outdoor adverting company founded in 1999. The business of VMG is the development, ownership and operation of Billboards primarily in the City.

**B. Defendants**

7.     The City is a municipal corporation organized and existing under the laws of the State of California.

8.     Outfront is a California Corporation engaged in the outdoor adverting business in Los Angeles, California.

9.     Plaintiffs are unaware of the true names and capacities of Defendants Doe 1 through Doe 25, inclusive, but are informed and believe and thereon allege

---

[2] Billboards or off-site signs are made available to national and local advertisers and other members of the public in a fashion similar to newspaper, magazine and broadcast advertising, and the messages on Billboards change periodically.  Billboards are used to convey a wide variety of commercial and non-commercial messages, including political, ideological, religious, charitable and public service messages. As such, Billboards are a recognized medium of communication and forum for free speech and the expression of ideas. In contrast, "on-site signs" advertise the business located on, or the products or services available at, the site where the sign is located.

On-site signs consist almost exclusively of permanent commercial messages advertising on-site businesses.  As such, on-site signs are not available to be used by third parties as is the case with Billboards and are not a medium for free speech and the expression of ideas by the public. Because of the nature of Billboards as a forum for free speech and the expression of ideas, they are protected under the First and Fourteenth Amendments to the Federal Constitution and under Article I, sections 2 and 7 of the California Constitution. (*Metromedia, Inc. v. City of San Diego* (1981) 453 U.S. 490 [101 S.Ct. 2882, 69 L.Ed.2d 800] and *Gerawan Farming, Inc. v. Lyons* (2000) 24 Cal.4th 468 [101 Cal.Rptr.2d 470, 12 P.3d 720].)

that each are responsible, in some manner, for the events and happenings alleged herein.  Plaintiffs therefore sue said Defendants under such fictitious names and will amend this Complaint to allege their true names and capacities when the same have been ascertained.

10.     Plaintiffs are informed and believe and thereon allege that at all times herein mentioned, Defendants, Doe 1 through 25, and each of them, were the agents, servants and employees of each of their Co-Defendants, and in performing the acts herein alleged were acting within the course and scope of their authority as such agents, servants and employees with the permission and consent of their Co-Defendants.

11.     Plaintiffs are also informed and believe and thereon allege that all of the Defendants names herein, and each of them, knowingly and willfully conspired and agreed among themselves to undertake the acts described below and to deny Plaintiffs rights guaranteed by the California and the United States Constitutions causing injury to Plaintiffs as described in greater detail below. Plaintiffs are further informed and believe and thereon allege that Defendants, and each of them, did the acts described herein pursuant to, and in furtherance of, such conspiracy and furthered the conspiracy by cooperating with other Defendants or by lending aid and encouragement or ratifying and adopting the acts of such Defendants.

## II. PRELIMINARY ALLEGATIONS

### A. Purported Prohibition on Off-Site Signs

12.     There currently exists and is in effect as part of the municipal code of the City (the "LAMC") a series of ordinances which regulate the erection and operation of all signs (the "Sign Ordinance"). Since at least 2002, the Sign Ordinance has purported to prohibit all new "off-site signs," more commonly known

**COMPLAINT**

as "Billboards." This prohibition includes both static and digital Billboards but does not impact signs which convey on-site messages. This purported ban shall hereafter be referred to as the "Sign Ban."

13.     Plaintiffs refer to the Sign Ban as "purported," because many Billboards have been constructed since its adoption. These new Billboards have been permitted based on numerous exceptions to the Sign Ban contained in the LAMC. However, because all such exceptions are discretionary, the effect of the Sign Ban has not been to prohibit Billboards but instead to allow them only for speakers favored by the City.

14.     In fact, Plaintiffs are informed and believe and thereon allege that the Sign Ban has not even significantly slowed the construction of Billboards but merely ensured that only certain favored speakers receive from the City the necessary government entitlements to allow their construction and operation. Furthermore, because all others are foreclosed from constructing new billboards, those whom the City has favored have seen the value of their new Billboards soar.

15.     The current version of the Sign Ordinance contains the following description of prohibited signs:

SEC. 14.4.4.  GENERAL PROVISIONS.

**B.     Prohibited Signs.  Signs are prohibited if they:**
11. (Amended by Ord. No. 180,841, Eff. 8/14/09.) **Are off-site signs, including off-site digital displays, except when off-site signs are specifically permitted pursuant to a relocation agreement entered into pursuant to California Business and Professions Code Section 5412.**  This prohibition shall also apply to alterations, enlargements or conversions to digital displays of legally existing off-site signs, except for alterations that conform to the provisions of Section 91.6216 and all other requirements of this Code.

**EXCEPTIONS:  This prohibition shall not apply to off-site signs, including off-site digital displays, that are specifically permitted pursuant to a legally adopted specific plan, supplemental use district or an approved development agreement.**  This exception shall become

**COMPLAINT**

operative only to the extent that Subdivision 11. is deemed constitutional upon the reversal of the trial court decision in the case of World Wide Rush, LLC v. City of Los Angeles, United States District Court Case No. CV 07-238 ABC. [Emphasis added.]

16.     Plaintiffs are informed and believe and thereon allege that the Sign Ban was not designed to limit Billboards but instead to allow certain favored speakers to maintain a monopoly on Billboards at the expense of the First Amendment rights of their competitor and the public.

17.     Plaintiffs are further informed and believe and thereon allege that the Sign Ban was also designed to artificially suppress ground lease rates for Billboard sites for the benefit of the few giant outdoor companies, including Outfront, which have monopoly or near monopoly control the Los Angeles market at the expense of thousands of property owners and taxpayers without payment of just compensation in violation of the Fifth Amendment.

**B. Origin of Purported Sign Ban**

18.     Plaintiffs are informed and believe and thereon allege that the origin of the City's purported Sign Ban was an agreement entered between a few of the nation's largest outdoor advertising companies, including, but not limited to Outfront, to unfairly stifle competition and maintain their monopolistic control over the Los Angeles Billboard market, which is the second largest in the United States.

19.     For several years before the enactment of the Sign Ban, smaller competitors, such as VMG, were making inroads into the Los Angeles Billboard market. Not only did this create competition which threatened the pricing structure of the established companies, but by competing to lease real property for Billboards, new entrants into the market began driving up prices for ground leases.

20.     Prior to this increase in competition, the few giant outdoor advertising companies operating in Los Angeles, including Outfront, were able to keep ad rates artificially high and ground lease rents unreasonably low. In fact, many Billboard

ground leases are decades old and have become month to month tenancies. Such leases generally offer property owners only a minuscule fraction of the true value of the leases. Plaintiffs are informed and believe and thereon allege that in many cases, outdoor advertising companies are paying only between one and five percent of their net revenue to the property owners at the Billboard sites.[3]

21.     Plaintiffs are further informed and believe and thereon allege that any property owner who demands a fair return on a ground lease for a Billboard site would be immediately threatened with the removal of the existing Billboard. Because of spacing requirements in the LAMC between Billboards and the purported Sign Ban, the giant outdoor advertising companies can merely "relocate" to another site nextdoor and prevent any new sign from being installed at the prior site. This situation gives these few monolithic companies a virtual stranglehold on Billboards sites, ad rates and property rents.

22.     Plaintiffs are informed and believe and thereon allege that the few giant outdoor adverting companies which have monopolistic control over the Los Angeles outdoor advertising market, including, but not limited to, Outfront and Doe 1 through Doe 25, and each of them, entered into a conspiracy to accomplish the anticompetitive goals described in this complaint, hereafter the "Anticompetitive Plan." The Sign Ban was a critical component of the Anticompetitive Plan, because it immediately rendered all existing Billboards legal, nonconforming uses of property and generally prevented the rebuilding of any Billboard removed as a result of demands from property owners for fair market rent.

---

[3] Although adverting rates vary wildly from site to site, depending on the location and volume of nearby vehicular traffic, in a typical case, an outdoor advertising company may earn between $30,000 and $50,000 a month at a single Billboard site and pay the owner of the real property only $500 a month. **In other words, an outdoor advertising company might earn as much as $360,000 a year from a single Billboard while paying the owner of the real property who makes the Billboard possible only $6000 annually, or less than two percent.**

**COMPLAINT**

23.     The outdoor adverting companies operating Billboards in the City and which participated in conceiving and putting into operation the Anticompetitive Plan include Outfront and Doe I through Doe 25 and each of them. These companies control nearly the entirety of the Los Angeles advertising market. Outfront (previously known as CBS Outdoor Americas, Inc.) operates over 400,000 billboards in 25 of the top media markets in the United States.

24.     These outdoor adverting companies dwarf their competition and exercise monopoly or near monopoly control over the Los Angeles adverting market. These monolithic outdoor advertising companies, the largest and most wealthy operating in Los Angeles and participating in the Anticompetitive Plan, shall be referred to hereafter collectively as the "Predatory Companies."

## C. City Policy of Issuing Building Permits to the Predatory Companies Without Property Owner Consent and Even Over Their Objection

25.     For decades, the City's Building Department has had a general practice of requiring contractors applying for building permits of any kind, including demolition and grading permits, to present proof of consent by the owner of the real property where the work is to be done. This is generally accomplished by presenting a notarized letter of authorization signed by the record owners of the real property.[4]

26.     One of the reasons for the above policy is that the City also has a general practice of holding the record owners of real property solely or primarily liable for any violations of the City's building and zoning codes occurring on their property. In such cases, the City issues citations and assesses monetary penalties

---

[4] In fact, Section 91.103.2. of the LAMC makes it a crime to obtain a building permit without consent of the property owner:

Violation of a Building or Grading Permit.   Every person who knowingly and willfully procures a building and/or grading permit without the consent of the owner of record of the property for which the permit is issued, or such person's agent, is guilty of a misdemeanor.

COMPLAINT

1   against the owners and places liens on their real property. Accordingly, where a

2   tenant undertakes unpermitted construction on any parcel of real property within the

3   City, it is almost invariably the record who are held responsible even where any

4   wrongdoing was committed solely by a tenant.

5          27.    Despite the foregoing, the City's Building Department regularly

6   departs from its normal practices and ignores the law in the case of outdoor

7   advertising companies, particularly the Predatory Companies, by allowing them

8   alone to obtain permits to demolish existing billboards without property owner

9   consent. Such permits have issued without the knowledge of the property owner and

10  frequently over the property owner's express objections. This practice is unique to

11  the outdoor advertising industry and contrary to the laws, policies and procedures of

12  the City's Building Department in all other cases.

13         28.    This policy by the City has been crucial in carrying out the

14  Anticompetitive Plan. It has not only allowed the Predatory Companies to punish

15  any property owner who demands a fair market rent from outdoor advertising

16  companies but has had a chilling effect on any others who be might do so and

17  demand fair market value for the leasing of Billboard sites.

18         29.    Plaintiffs are informed and believe and thereon allege that the City's

19  policy of issuing permits without property owner consent in the case of Billboards

20  has been used by the Predatory Companies to unfairly destroy the value of ground

21  leases for Billboard sites and keep out any competition. Plaintiffs are further

22  informed and believe and thereon allege that the City has aided the Predatory

23  Companies in this effort to implement the Anticompetitive Plan by ignoring the

24  requirements of the LAMC and has destroyed the value of thousands of parcels of

25  real property without the payment of a single penny in compensation.

26         30.    There are more than 10,000 Billboard sites in the City and many

27  thousands have had their value severely limited or virtually destroyed through the

28  City's support and implementation of the Anticompetitive Plan. Plaintiffs are

**COMPLAINT**

1  informed and believe and thereon allege that the resulting loss in revenue and
2  property value amounts to hundreds of millions of dollars and continues to accrue.

3

4  **D. Tactics of Predatory Companies in Action**

5      31.    Karraa recently tried to obtain fair market rent for a Billboard located
6  on the Service Station Property and being operated by Outfront (hereafter the "First
7  Karraa Billboard"). However, the response by Outfront demonstrates the Predatory
8  Plan in operation.

9      32.    The First Karraa Billboard was constructed in 1997 by an outdoor
10  advertising company other that Outfront. However, the original lease was renewed
11  and amended several time and eventually acquired by Outfront. The last operative
12  version of the lease was scheduled to expire on or about August 31, 2019. Prior to
13  the lease expiration, Karraa contacted Outfront in an attempt to negotiate a new
14  lease and increased rental amount reflecting fair market value. All such efforts by
15  Karraa were rebuffed, and he could not even get a return phone call from Outfront.

16      33.    Because Karraa received no response from Outfront to his request to
17  negotiate a new lease, he contacted VMG and entered into a new contract to operate
18  the First Karraa Billboard at the Service Station Property after Outfront's lease
19  terminated.

20      34.    Only after Outfront received notice of the new contract between
21  Karraa and VMG did it attempt to negotiate a rent increase with Karraa. Outfront
22  threatened Karraa that if he leased to VMG, they would punish him by removing the
23  large steel pole that had supported the First Karraa Billboard for more than two
24  decades and seek to prevent any other Billboard from ever being operated at the
25  Service Station Property.

26      35.    As Karraa had already signed the new lease with VMG, Outfront's
27  belated efforts were fruitless. In order to ensure a smooth transition and prevent
28  disruption of the business of the Mobile gas station operated by Karraa, VMG

**COMPLAINT**

offered to buy from Outfront the large steel pole which had supported the Billboard. VMG offered to pay Outfront $180,000, significantly more than the cost of rebuilding the Billboard. This offer would also save Outfront the $20,000 to $30,000 cost of removing parts of the existing structure.

36.     Outfront did not respond to the offer from VMG. Instead, and true to its threats, Outfront immediately applied to the City's Building Department for a permit to remove the existing pole. This application was made by Outfront without the knowledge or permission of Karraa. When later Karraa learned of the application, and before any permit was issued, he objected to the City and informed the Building Department that the owner of the Service Station Property had not given consent to the issuance of such a permit which he feared might destroy a legal, nonconforming structure and constitute legal waste.

37.     The City Building Department ignored all of Karraa objections and the provisions of the LAMC requiring property owner consent before issuance of any permit. Over Karraa's express written objections, the City's Building Department issued a permit to Outfront which then proceeded to move heavy construction equipment onto the Service Station Property, disrupting the business of the gas station, and removing the above ground portions of the First Karraa Billboard.

38.     A steel column supporting a Billboard that has been in the ground for more than two decades is generally not reusable, both because of its condition and because of changing industry standards and building codes. Plaintiffs are informed and believe and thereon allege that the value of the removed pole of the First Karraa Billboard is no more than $5000 to $7500 as scrap metal. Plaintiffs are further informed and believe and thereon allege that the draconian tactics of Outfront cost the company approximately $210,000 by foregoing the cash offered by VMG to purchase the old steel column in place and insisting on incurring the expense of its removal.

39.     Plaintiffs are further informed and believe and thereon allege that the acts undertaken by Outfront in regard to the First Karraa Billboard were entire consistent with the Anticompetitive Plan, including, but not limited to:

a. Karraa was punished for seeking a fair market rent;

b. A warning was sent to other property owners who might do likewise;

c. no general pattern would be established of increasing ground lease rents; and

d. Outfront's smaller competitor, VMG, would not be able to enter the market.

40.     Plaintiffs are informed and believe and thereon allege that punishing Karraa and making an example of him was important to Outfront for another reason. There is a second Billboard located on the Service Station Property which has also been inherited by Outfront and the lease for which will soon expire (the "Second Karraa Billboard").  Plaintiffs are informed and believe and thereon allege that Outfront wanted to make sure that Karraa would not feel that he had any option but to agree to whatever terms Outfront stooped to offer in renewing the lease for the Second Karraa Billboard and that he would abandon any thought of obtaining fair market value.

41.     The lease under which Outfront operated the First Karraa Billboard at the Service Station Property also contained a provision that Outfront would restore the property to its original condition at upon termination. At the time that the original lease was executed in 1997, the condition of the Service Station Property was that a Billboard could be constructed. At the time of termination in 2019, and in part as a result of efforts by Outfront to implement the Anticompetitive Plan, all existing Billboards became legal, nonconforming uses of property. Accordingly, Outfront did not restore the Service Station Property to its 1997 condition but instead took punitive steeps to substantially lessen its value by attempting to demolish a legal, nonconforming use.

**E. City's Refusal to Allow the Replacement of Above-Ground Portions of the First Karraa Billboard**

42.     Though Outfront dismantled the above ground components of the First Karraa Billboard, it left in place the underground portions, including the support column and cement foundation, which extends 20 to 30 feet below ground and weighs thousands of pounds.

43. The standard monopole Billboard in Los Angeles is constructed with a single steel column generally approximately five feet in diameter and 50 to 60 feet long. Ordinarily, the Billboard is installed by auguring a hole seven to eight feet in diameter and at least 25 to 30 feet deep. The steel column is then lowered by crane into the hole and filled with cement. This leaves the remainder of the column above ground and generally allowing for the display frame or "superstructure" to be bolted to the above ground portion of the column. However, the visible, above ground portions of a Billboard represent only a small fraction of the entire structure and its cost.[5] The diagram below shows the above ground portion of a typical Billboard:



---

[5] In some situations, where the soil is unusually sandy or otherwise unstable, a round steel cage or caisson made from rebar must also be used to line the inside of the hole in order to keep back the soil until the cement can be poured.

13                                          **COMPLAINT**

44.    The diagram below illustrates both the above and below ground components of a typical Billboard:



45.    All of the above means that a very substantial portion of a Billboard is generally underground and unseen. In fact, the cost of the underground potions of a Billboard, including installation, generally exceed the cost of the above ground portions.

46.    In the case of the First Karraa Billboard, the below ground portion would cost approximately $ 250,000 to $300,000 to install, while replacing the above ground portions would cost approximately $150,000 to $200,000. In other words, more than 50 percent of the structure in terms of its cost remains in place on the Service Station Property.

47.    The 50 percent figure is highly significant, because the LAMC provides that legal, non-conforming Billboards may be "altered, repaired or

rehabilitated" so long as the cost of the work does not exceed 50 percent of the replacement cost and there is no increase in height or size. Section 91.6216.4 of the LAMC provides the following:

**91.6216.4. Alterations, Repairs or Rehabilitation.**

91.6216.4.1. Alterations, repairs or rehabilitation of any existing sign and/or support structure may be of the same type of construction as the existing sign or sign support structure provided:

  1.   The aggregate value of the work in any one year does not exceed ten percent of the replacement cost of both the sign and sign support structure; and

  2.   That there is no increase in sign area or height and no change in the location or orientation of the sign.

91.6216.4.2. Alterations, repairs or rehabilitation of existing sign and/or sign support structures in excess of ten percent of the replacement cost of both the sign and sign support structure **may be made provided:**

  **1.   That the cost of the work does not exceed 50 percent of the replacement cost of both the sign and sign support structure; and**

  **2.   That there is no increase in the sign area or height and no change in the location or orientation of the sign; and**

  3.   All new construction shall be as required for a new sign of the same type.

**91.6216.4.3. Alterations, repairs or rehabilitation of existing sign and/or sign support structures that exceed 50 percent of the replacement cost of both the sign and sign support structure shall comply with all the requirements of this Code**. [Emphasis added.]

48.      In addition to the, the Service Station Property is located within an area that the City has designated as the Hollywood Signage Supplemental Use

District created by Ordinance No. 176172 and is subject to additional sections of the LAMC. Specifically, the Service Station Property and the First Karraa Billboard are also governed by Ordinance No. 181340 which contains the following provision at Section 6. I.:

> **Existing Signs. Every existing sign and/or sign support structure constructed under a valid permit** and used in conformance with the Code regulations and LADBS approvals in effect at the time of construction **shall be allowed to continue to exist** under those regulations and approvals even though subsequent adopted regulations and approvals have changed the requirements. All existing non-conforming signs shall be included in computing total sign area. **There shall be no increase in sign area or height and no change in the location or orientation of any existing non-conforming sign.** Before the issuance of a building permit for a new sign on a lot, all existing unpermitted signage on that lot shall be removed or demolished. [Emphasis added.]

49.     Based on the foregoing, VMG and Stephens caused to be submitted to the City on behalf of Karraa an application to alter, repair or rehabilitate the First Karraa Billboard by replacing the above ground portions that had been dismantled by Outfront. The application also made it clear that there would be no change in the area, height, location or orientation of the existing sign.

50.     Though the cost of the work for which VMG and Stephens sought a permit was less than "50 percent of the replacement cost of both the sign and sign support structure" and they were entitled to a permit pursuant to the LAMC, the application was wrongfully denied.

51.     Plaintiffs are informed and believe and thereon allege that such denial was not only in violation of the provisions of the LAMC as well an uncompensated taking in violation of the Fifth Amendment to the United States Constitution, but that it was also done in furtherance of the Anticompetitive Plan.

16

**COMPLAINT**

**F. Failure to Enforce Sign Ordinance Against Predatory Companies**

52.     The City has also routinely ignored Billboards constructed and operated by the Predatory Companies without any permit and in violation of the LAMC. In 2002, the City paid for an inventory to be compiled of Billboards which were either initially constructed or subsequently modified without a valid building permit. The inventory revealed nearly 1000 such signs being operated for years in violation of the LAMC.

53.     Plaintiffs are informed and believe and thereon allege that the City has generally allowed the Predatory Companies to continually violate the LAMC while generally prosecuting only their much smaller competitors and individual property owners. Such action has been taken by the City despite requests from the City Attorney's Office to be allowed to enforce the LAMC against the Predatory Companies.

54.     LAMC section 11.00 (l) and (m) provides significant civil and criminal penalties for construction undertaken without permits. LAMC section 11.00, subdivision (l), provides that: "Violations of this code are deemed continuing violations and each day that a violation continues is deemed to be a new and separate offense and subject to a maximum civil penalty of $2,500 for each and every offense."

55.     Similarly, LAMC section 11.00, subdivision (m), declares that: "Any person violating any of the provisions or failing to comply with any of the mandatory requirements of this Code, shall be guilty of a misdemeanor unless that violation or failure is declared in this Code to be an infraction." It goes on to state: "Every violation of this Code is punishable as a misdemeanor unless provision is otherwise made, and shall be punishable by a fine of not more than $1,000.00 or by imprisonment in the County Jail for a period of not more than six months, or by both a fine and imprisonment."

**COMPLAINT**

56.     Plaintiffs are informed and believe and thereon allege that many of the unpermitted Billboards described in the inventory have been operated for many years, in fact the majority have been in place for more than five years each. The penalties owed to the City for a single year for the operation of 1000 unpermitted Billboards is approximately $912,500,000.[6]

57.     Furthermore, the City has concluded that Billboards impose a burden on the public as a detriment to substantial governmental interests such as traffic safety and aesthetics.[7]  Accordingly, the continued existence of nearly 1000 unpermitted Billboards imposes a significant burden on the general public to the benefit of a few giant outdoor advertising companies, including the Predatory Companies.

58.     Plaintiffs are informed and believe and thereon allege that both the City's action and inaction has resulted in an improper and ultra viries gift of public assets to the Predatory Companies.

59.     The Predatory Companies regularly make large contributions to political campaigns in the City both in the form of cash, gifts and ad space for political campaigns. Plaintiffs are informed and believe and thereon allege that in some cases, such political ads for City officials have actually appeared on Billboards being maintained in violation of the LAMC.

---

[6] At a time when the City claims to be searching diligently for funding for programs such as housing the homeless, its refusal to take any action to collect the very substantial monies owed for the blatant and continued violation of the LAMC by favored outdoor advertising companies is incomprehensible.

[7] Plaintiffs do not concede that Billboards actual cause any harm to these stated interests. This is partrtcularly true where the City has banned all Billboards, static or digital, since 2002 but has been allowing the proliferation of both on-site and off-site digital signs. Certainly any harm to traffic safety or aesthetics allegedly flowing from static Billboards is multiplied many times over for digital signs, whether on-site of off-site.

In some instances, where the City has concluded that a static billboard is a hazard, it has allowed more favored speakers to place larger, brighter and far more intrusive digital signs. Plaintiffs contend that this practice is merely one more example of how the City has dishonestly and hypocritically manipulated the LAMC and the protections of the State and Federal Constitutions solely to help certain favored parties.

**COMPLAINT**

**G. Relocation Agreements and Digital Billboards**

60.     One of the legal exceptions to the Sign Ban is for Billboards which are "relocated" pursuant to an agreement with the City. (LAMC section 14.4.4 B. 11.) However, such relocation is a legal fiction to the extent that no Billboard is actually relocated. Instead, relocation involves the removal of one Billboard and erecting an entirely new one at a different more profitable site.

61.     The provision in the LAMC allowing for Relocation Agreements as a means of circumventing the Sign Ban is explicitly premised on a state law found in Business and Profession Code section 5412, which provides, in pertinent part, the following:

> **Notwithstanding any other provision of this chapter, no advertising display which was lawfully erected anywhere within this state shall be compelled to be removed, nor shall its customary maintenance or use be limited,** whether or not the removal or limitation is pursuant to or because of this chapter or any other law, ordinance, or regulation of any governmental entity, **without payment of compensation**, as defined in the Eminent Domain Law (Title 7 (commencing with Section 1230.010) of Part 3 of the Code of Civil Procedure), except as provided in Sections 5412.1, 5412.2, and 5412.3. **The compensation shall be paid to the owner or owners of the advertising display and the owner or owners of the land** upon which the display is located.
>
> *          *          *
>
> **"Relocation," as used in this section, includes removal of a display and construction of a new display to substitute for the display removed.**
>
> It is a policy of this state to encourage local entities and display owners to enter into relocation agreements which allow local entities to continue development in a planned manner without expenditure of public funds while allowing the continued maintenance of private investment and a medium of public communication. Cities, counties, cities and counties, and all other local entities are specifically empowered to enter into relocation agreements on whatever terms are agreeable to the display owner and the city, county, city and county, or other local entity, and to adopt ordinances or resolutions providing for relocation of displays. [Emphasis added.]

**COMPLAINT**

62.     Consistent with the guarantees of the Fifth Amendment regarding the taking of private property, section 5412, which is specifically acknowledged in the LAMC as the basis for the City's entry into Relocation Agreements, provides for compensation not only to the outdoor advertising companies but also to the owners of the real property where Billboards are removed.

63.     Despite the foregoing, Plaintiffs are informed and believe and thereon allege that the City has routinely entered into Relocation Agreements which give outdoor advertising companies, including the Predatory Companies, the right to demolish a Billboard at one site, depriving the land owner of further rent and significantly diminishing the value of the subject real property, and erect a new Billboard at a more profitable site without any compensation whatsoever to the former lessor.

64.     The willingness of the City to allow the removal of legal, non-conforming Billboards, including issuing building permits without property owner consent or compensation, is another key component of the Anticompetitive Plan.

**H. Other Exceptions from the Purported Sign Ban Have Been Granted Only to Favored Speakers.**

65.     The United States Supreme Court has repeatedly held that when the government restricts speech, it bears the burden of proving the constitutionality of its actions. (*United States v. Playboy Entertainment Group* (2000) 529 U.S. 803, 816-817, 120 S.Ct. 1878, 1888, 146 L.Ed.2d 865, 881-882.) In order to meet this burden, the government must, among other things, identify an interest of sufficient importance to justify its restriction on First Amendment rights. (*Greater New Orleans Broad. Association v. United States* (1999) 527 U.S. 173, 188, 119 S.Ct. 1923, 1932, 144 L.Ed.2d 161, 177.) Furthermore, exemptions from an otherwise legitimate regulation of a medium of speech tend to diminish the credibility of the government's rationale for restricting speech in the first place. (See, e. g., *Cincinnati*

*v. Discovery Network, Inc*., 507 U.S. 410, 424-426, 123 L. Ed. 2d 99, 113 S. Ct. 1505 (1993).)

66.    As indicated above, there are numerous discretionary exceptions from the purported Sign Ban, specifically for those Billboards which are the subject of a legally adopted specific plan, supplemental use district, development agreement or relocation agreement. (LAMC 14.4.4 B. 11).

67.    Plaintiffs are informed and believe and thereon allege that the City has repeatedly and on a regular basis granted exemptions to the Sign Ban, but only for certain favored speakers, particularly those with great wealth and resources, to the exclusion of virtually all others. The City has done so, even though Billiards constructed and operated by wealthy individuals and companies, including the Predatory Companies, logically cause all of the same alleged harms as those operated by less wealthy citizens. Plaintiffs are further informed and believe and thereon allege that the granting of such selective exemptions have been undertaken by the City in large part not to further any legitimate governmental interest but to advance the Anticompetitive Plan.

68.    Plaintiffs are further informed and believe and thereon allege that by granting exemptions only to favored speakers, including the Predatory Companies, the City is able to pressure those individuals and companies seeking to maintain favored status to censor the content of their speech (in violation of the First Amendment) or agree to bestow certain valuable favors on the City as a condition of development (in violation of the Fifth Amendment).

69.    The granting of such exemptions also illustrates that the City has no actual desire to advance those interests it claims are furthered by the Sign Ban nor that it has actually made any progress in advancing such interests.

70.    In order for the government to meet its burden of proving the constitutionality of even a content neutral restriction on speech, it must, among other

21

**COMPLAINT**

things, prove both that the law was actually adopted to advance a substantial governmental interest and also that the law has "directly advanced" such interest. (*Cent. Hudson Gas & Elec. Corp. v. Public Serv. Comm'n* (1980) 447 U.S. 557, 591, 100 S.Ct. 2343, 2364, 65 L.Ed.2d 341, 367, and *Bd. of Trs. v. Fox* (1989) 492 U.S. 469, 474-475, 109 S.Ct. 3028, 3031-3032, 106 L.Ed.2d 388, 400.)  Furthermore, where the government can show only minor, incremental improvements in its stated goals, a restriction on speech will not be upheld. (*Cincinnati v. Discovery Network* (1993) 507 U.S. 410, 443, 113 S.Ct. 1505, 1524, 123 L.Ed.2d 99, 125.)

71.    A restriction on speech adopted for improper purposes, such as to advance the Anticompetitive Plan, or which is so full of holes that fails to directly advance the government's stated goals or does so to only a minor degree, will not pass constitutional muster. The burden on speech represented by such a law will not be found to be constitutionally justified.

72.    In another demonstration of the City acting to further the Anticompetitive Plan, it City has refused to allow some Billboards to operate at certain geographic locations, determining that such areas are highly inappropriate for Billboards as they create unique and serious dangers to traffic safety and aesthetics. In some cases, the City has not only pressured the removal of Billboards from such areas but has even resorted to criminal prosecutions to do so.

73.    Most of the sites where the City has tried to force the removal of Billboards are in close proximately to the freeway, sites which are generally more profitable and more effective for communications because they are visible to a large number of motorists. In fact, the City has enacted special rules requiring the evaluation by its Department of Transportation of the traffic safety of any Billboard within 2000 feet of a freeway. (LAMC section 14.4.6.)[8] However, as the City has absolutely no guidelines on how such a traffic safety determination is to be made,

---

[8] Most on-site signs are completely exempted from such traffic safety analysis. (See LAMC section 14.4.6 B.)

1   this provision of the LAMC has become just another way of helping certain favored

2   speakers, including the Predatory Companies, to obtain control of the most

3   profitable and effective Billboard sites.

4        74.   In some cases, where the City has fought strenuously to have

5   Billboards removed, contending that a particular site is especially unsuitable for

6   such a land use, it has then gone on to allow others, including the Predatory

7   Companies, to install Billboards at the same sites, including larger and brighter

8   digital Billboards. Plaintiffs are informed and believe and thereon allege that such

9   action by the City again demonstrates that it is not interested in removal of

10   Billboards to accomplish any legitimate government interest, such as improving

11   traffic safety, but instead to clear certain areas of Billboards operated by small

12   companies or property owners so that favored speakers can then building their own

13   static or digital billboards in the same areas.

14        75.   It has been infuriating for Plaintiffs and other similarly situated

15   property owners and  independent Billboard companies to be told that their small

16   static sign cannot be allowed to exist because they create an unreasonably dangerous

17   condition in terms of traffic safety and aesthetics only to see the City later publish

18   findings, in adopting one of the discretionary exceptions to the Sign Ban,

19   specifically concluding that a much larger digital Billboard operated by a favored

20   speaker would actually constitute a great benefit to the aesthetics and traffic safety

21   of the exact same area.

22        76.   One staggering example of this extraordinary favoritism can be seen in

23   "The Reef" a development located at 1900 South Broadway. After attempting to

24   justify a ban on digital signage under the claim that they constitute an overwhelming

25   detriment to both aesthetics and traffic safety, the City recently approved the

26   installation of 69,278 square feet of digital signage of three sides of a building

27   adjacent to the 10 freeway, as depicted below:

28

**COMPLAINT**

1
2
3
4
5
6
7
8
9
10
11
12
13
14



15    77.    The massive digital signs allowed by the City at the Reef are less than

16  1000 feet from the busy 10 freeway. However, the City has determined that signs

17  are so dangerous in terms of traffic safety that it requires them to be evaluated by its

18  Building and Safety and Transportation Departments if located within 2000 feet of

19  any freeway. (LAMC sections 14.4.5 and 14.4.6).

20    78.    Plaintiffs are informed and believe and thereon allege that the City has

21  no formal guidelines for when and how such a determination is made. Instead,

22  Plaintiffs are informed and believe and thereon allege that the City has continually

23  manipulated such provisions of the LAMC in a manner having little or nothing to do

24  with traffic safety and everything to do with furthering the Anti-Competitive Plan

25  and assisting certain favored speakers and developers, who in many cases have been

26
27
28

**COMPLAINT**

coerced into bestowing benefits on the City as a condition of development in violation of the First and Fifth Amendments to the Federal Constitution.[9]

79.    The national outdoor advertising industry standard for Billboards is 14 x 48 feet (672 square feet). Accordingly, the massive digital signage at The Reef is the equivalent of more than 103 Billboards, approved by the City through a discretionary exemption at the same time that it continues to claim that Billboards are so damaging to traffic safety and aesthetics that nothing short of a complete ban is sufficient to protect the public. The above picture depicts only two of the large digital signs that are placed on the three sides of the building visible to the 10 freeway.

80.    The massive scale of the exemption for The Reef is all the more surprising, because the City has routinely rejected the construction and operation of standard outdoor adverting structures, even static ones, of only 672 square feet in nearly identical areas.[10]

81.    If called upon, Plaintiffs can produce numerous similar examples of exemption granted by the City to its friends.

_____

[9] In fact, Stephens and a local property owner are currently being criminally prosecuted by the City in Los Angeles Superior Court Case No. 4CA03603 for maintaining a single billboard with two displays faces measuring only 672 square feet each in close proximity to other massive digital and static signs that the City has not only permitted but published findings stating that they are an actual benefit to both aesthetics and traffic safety.

[10] Caltrans limits both digital and static Billboards to a maximum of 1200 square feet ostensible to further the same interests in traffic safety and aesthetics used by the City to justify its claimed ban on such signs. The Reef does not fall under Caltrans jurisdiction, though it is highly visible form the 10 freeway. Caltrans has concurrent jurisdiction over such signs only if they are within 660 feet (one furlong) of the freeway. The Reef is approximately 690 feet from the freeway and barely escapes the prohibition on such a massive sign by the State. If the Reef's massive signs were 30 feet closer to the freeway, they would be prohibited by the State as a traffic hazard. However, City has used this 30-foot difference to allow the installation of these monolithic signs, though it claims it seeks to further the same interest in traffic safety as that promoted by the State.

Furthermore, the City does not limit itself to merely prohibiting massive sign within 660 feet of the freeway as does Caltrans. Instead, the City bans nearly all signs, except building identification signs, from a zone extending 2000 feet on each side of the freeway. What possible justification the City can possibly claim for exempting The Reef's behemoth digital signs from its own ban is unfathomable. Either such signs are a hazard to traffic and an aesthetic detriment, or not, without reference to how well financed and connected the developer happens to be.

**COMPLAINT**

**I. The Costs Imposed by the City, as Embodied in it Exceptions to the Sign Ban, Are Unconstitutional, Because there is no Reasonable Nexus to Any Alleged Harm Flowing From Operation of Billboards**

82.     All of the exceptions that the City has created to the Sign Ban require successful applicants to expend very significant amounts of money or bestow other valuable benefits on the City, including, in many cases, a share in the revenue generated from Billboards.

83.     Plaintiffs are informed and believe and thereon allege that conditioning the granting of an exception to the Sign Ban only on the expenditure of such large amounts of money constitutes what is in most cases an insurmountable obstacle.

84.     The enormous barriers to speech embodied in the very expensive exceptions to the Sign Ban effectively deny that right to the vast majority of people. Only the wealthiest outdoor advertising companies and developers, including the Predatory Companies, are able to exploit the exceptions. However, there is no nexus between the harms allegedly caused by Billboards and the burdens the City has imposed as the cost of entry. Instead, the City has just arbitrarily decided to add a huge financial component as a precondition to constructing and operating Billboards, in effect selling the right to civil rights to the highest bidder and converting liberties guaranteed by the First and Fifths Amendments into largesse by the municipal government.

85.     Case law concerning the imposition of fees on developers has consistently held that the constitutionality of conditioning permits on the payment of special fees requires a relationship between such fees and the increased burden on the public caused by the development. Fees that are imposed without a reasonable nexus between a land use and the burdens it brings amount to an unconstitutional abuse of the state's police powers (See, e.g., *Associated Home Builders etc., Inc. v.*

**COMPLAINT**

*City of Walnut Creek* (1971) 4 Cal.3d 633, 644-645, 94 Cal.Rptr. 630, 484 P.2d 606.)

86.     Plaintiffs are informed and believe and thereon allege that the expenses the City has imposed as a precondition to building and operating Billboards has little or no connection to the harms that allegedly flow from them. Therefore, such action by the City is a constitutionally invalid use of its police powers.

87.     Plaintiffs are further informed and believe and thereon allege that the City's invalid use of its police powers is actually designed to substantially further the Anticompetitive Plan by favoring the very wealthy and favored developers, including the Predatory Companies.

## J.  City's Manipulation of On-Site/Off-Site Distinction to Allow Favored Speakers to Avoid the Sign Ban Applicable to All Others.

88.     The City's Sign Ban applies only to "off-site" sign, which are defined in LAMC Section 14.4.2 as follows:

> Off-Site Sign. A sign that displays any message directing attention to a business, product, service, profession, commodity, activity, event, person, institution or any other commercial message, which is generally conducted, sold, manufactured, produced, offered or occurs elsewhere than on the premises where the sign is located.

89.     Signs characterized by the City as "on-site" are exempt from the Sign Ban. However, LAMC Section 14.4.2 contains a mere circular definition and states that an on-site sign is: "A sign that is other than an off-site sign."

90.     Because the Sign Ban applies only to those signs displaying off-site content, the City's subjective determination of whether the content of a given message is sufficiently related to those activities occurring at the site of the sign is

dispositive of its legal status. Plaintiffs are informed and believe and thereon allege that the City has regularly manipulated the definition of on-site and off-site messages to advantage favored speakers and again advance the Anticompetitive Plan.

91.     Such manipulation has included characterizing as on-site many messages that are similar or identical to those that have been determined to be off-site for less favored speakers. In other words, the exact same ad displayed by a favored speaker will be characterized by the City as on-site and legally permitted while the same content is determined to be off-site and subject to the Sign Ban for disfavored speakers.

92.     There are innumerable instances in which the City has characterized a particular advertising message as on-site to allow favored speakers to avoid the Sign Ban. For example, the enormous advertisement shown below was displayed for months at the Ritz Carlton hotel adjacent to LA Live:

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25



26    93.    When the City received complaints about the installation of the above

27  depicted off-site sign in violation of the Sign Ban, it issued an "Order to Comply" to

28  the Ritz Carlton on or about June 2, 2009. However, the City then closed its file,

1   with the building inspector concluding that the Coca Cola advertisement was

2   exempt from the Sign Ban because it was on-site. No similar favorable

3   determinations have been made for less wealth parties who are regularly preventing

4   form displaying similar messages.

5       94.    One of the problems with this determination as to the Ritz Carlton is

6   that nearly identical ads were determined by the City to be off-site when maintained

7   by less favored speakers. While the Ritz Carlton no doubt serves Coca Cola, any one

8   of the property owners where the same ad was determined to be off-site could do the

9   same. However, Plaintiffs are informed and believe and thereon allege that is all

10  cases where less favored speaker attempted to avoid the Sign Ban by offering for

11  sale the products featured on their Billboard, the City concluded that such activity

12  was not "sufficiently related" to the ad to render it on-site.[11]

13      95.    Such discriminatory application of the law clearly denies Plaintiffs

14  their First Amendment rights. Furthermore, in the First Amendment context, legal

15  schemes that give too much discretion to government authorities to pick and choose

16  who may speak create unfettered discretion and are unconstitutional. (*Desert*

17  *Outdoor Advertising v. City of Moreno Valley* (9th Cir. 1996) 103 F.3d 814.)

18      96.    By way of example, if the owner of property installs a bank ATM or

19  soft drink dispenser, would that be sufficient to make on-site the display of a bank or

20  soft drink related advertisement? The LAMC provides no answer for when an

21  activity is sufficiently related to a site to make its advertisement on-site, though

22  tremendous amounts of money are involved and the display of prohibited off-site

23  advertisement is a criminal offense punishable by fines and imprisonment. The lack

24  of specificity and objective and detailed guidelines furthermore results in both the

25  inability of the average person to understand what is prohibited as well as allowing

26  the City broad and constitutionally impermissible discretion to discriminate and

27

28

---

[11] Plaintiff is informed and believes that the Coca Cola ad was subsequently replaced at the Ritz Carlton with one for Budweiser Beer.

**COMPLAINT**

extend favorable treatment only to certain speakers and messages while denying the same right to all others.

### K. The City's Most Recent Effort to Advance the Anticompetitive Plan Focuses on Digital Billboards

97.    Plaintiffs are informed and believe and thereon allege the City is implementing a new comprehensive scheme designed to further the Anticompetitive Plan, benefit certain favored speakers and accomplish a massive city-wide series of uncompensated takings in violation of the Fifth Amendment. Plaintiffs are further informed and believe and thereon allege that Outfront and Doe 1 through Doe 25, and each of them, will directly benefit by this new scheme and that its success will further substantially advance the Anticompetitive Plan.

98.    The new scheme seized upon by the City and the Predatory Companies is to remove hundreds of small static Billboards from sites around the City and "Relocate" them in the form of new much larger, brighter and more intrusive digital Billboards at other more profitable sites.

99.    Plaintiffs are informed and believe and thereon allege that the Relocation of these static Billboards to new digital Billboards is being accomplished without the payment of just compensation to thousands of property owners, resulting in the uncompensated taking of hundreds of millions in value.

100.   Plaintiffs are further informed and believe and thereon allege that the wholesale loss of rental income to local property owners will disproportionately impact the financially disadvantaged and racial and ethnic minorities, as many of the Billboards to be removed are located in economically disadvantages areas of the City. However, such action is designed to and will again further the Anticompetitive Plan and favor the Predatory Companies.

101.   To exacerbate the Fifth Amendment violation being committed by the City with the aid of the Predatory Companies, Plaintiffs are further informed and

**COMPLAINT**

believe and thereon allege that in many cases, the City is encouraging the Relocation of Billboards to City owned property. In other words, not only is the City seeking the removal of thousands of existing static Billboards and then "relocated" without compensation to property owners, but it seeks to make a profit while doing so. The lease payments which were previously received by private property owners from the Predatory Companies will now instead be paid in many cases to the City.

102.   The exception the City is making for Billboards relocated to City property also calls into question the legitimacy of the Sign Ban and the City's claimed interest in improving traffic safety and aesthetics. If Billboards are such a detriment to the governmental interests the City claims it seeks to further through the Sign Ban, then the relocation of Billboards to public property, even with a corresponding increase in public revenue, should be of no interest to the City.

103.   To further exacerbate the hypocrisy of the City's actions, Plaintiffs are informed and believe and thereon allege that many of the sites of the relocated Billboards will be in the 2000 foot exclusion zone which the City has designated in the LAMC as unusually deleterious to traffic safety.

104.   Having artificially made Billboards a scarce commodity and unfairly suppressed ground lease rents for private parties, the City now want to "cash in." Plaintiffs are informed and believe and thereon allege, that while the City has allowed the Predatory Companies to keep ground lease rents artificially and unfairly low, that it is now demanding a percentage of the revenue earned from those Billboards that are being Relocated to City property. In First Amendment jurisprudence, the raising of revenue has never been held by any court to be a "substantial governmental interest" so as to justify a restriction on speech.

105.   The Predatory Companies have been focusing much of their efforts to further advance the Anticompetitive Plan on building digital Billboards since their

**COMPLAINT**

efforts were frustrated in *Summit Media.*[12] The primary reason for this is that digital Billboards are generally far more profitable than static ones. Whereas a static Billboard can convey only one message at a time, digital Billboards are allowed to display as many as eight message a minute under state law. This allows the Predatory Companies to vastly increase their profits by renting each digital Billboard to multiple advertisers simultaneously. The City is supporting this effort by the Predatory Companies, regardless of resistance by the general public to digital Billboards, which are significantly brighter and more invasive and multiply many times any alleged harm flowing from static Billboards.

106.    The United States Supreme Court found that Billboards could reasonable be considered a greater detriment to traffic safety and aesthetic than traditional on-site signs because of their "periodically changing content." (*Metromedia, Inc. v. City of San Diego* (1981) 453 U.S. 490, 511 [101 S.Ct. 2882, 2894, 69 L.Ed.2d 800, 817].) However, while static Billboards generally change messages once every month, digital Billboards do so as frequently as every eight seconds. Accordingly, the by seeking to convert static Billboards into digital ones, the City is undercutting the exact legal theory on which the Sign Ban is premised.

107.    While the City's efforts to help the Predatory Companies transform their static Billboards into digital ones substantially furthers the Anticompetitive Plan, it significantly sets back those very interests for which the Sign Ban was allegedly adopted. If static Billboards are a danger to traffic safety and an aesthetic detriment, digital Billboards cause far greater harm. However, Plaintiffs are informed and believe and thereon allege that the Sign Ban was not adopted to

---

[12] (*Summit Media LLC v. City of Los Angeles* (2012) 211 Cal.App.4th 921, 150 Cal.Rptr.3d 574 [an agreement that allowed certain favored companies to circumvent the City's ban on digital billboards was ultra vires].) It is highly noteworthy that one of the parties entering into the agreement with the City that was ultimately found invalid was CBS Outdoor, Inc., the predecessor to Outfront.

**COMPLAINT**

advance the government interests claimed by the City but instead for the primary purpose of furthering the Anticompetitive Plan.

108.   The advent of new digital technology has also called into doubt the reasoning of the Supreme Court from 1980 in *Metromedia, Inc. v. City of San Diego*, when it stated that it was reasonable for a municipality to conclude that on-site signs, with their static, non-changing message, could be seen as more of a distraction to drivers than traditional Billboards that changed messages monthly. This 40-year-old analysis does not logically justify allowing the City to continue to ban static off-site Billboards as a traffic hazard while allowing numerous on-site digital signs that change messages every eight seconds.

## L. The City Has Destroyed an Entire Medium of Communication by Creating Artificial and Unreasonable Barriers to Entry

109.   By artificially increasing the cost of entry into outdoor adverting, the City has furthered the Anticompetitive Plan and destroyed an entire medium of communication without leaving ample alternative channels.

110.   Plaintiffs are informed and believe and thereon allege that the exceptions from the Sign Ban, for legally adopted specific plans, supplemental use districts, approved development agreements and relocation agreements, require the expenditure of very large sums of money having nothing to do with Billboards or the harms that allegedly flow from their operation. Plaintiffs are further informed and believe and thereon allege that the imposition of such costs as a prerequisite to constructing and operating a Billboard advances no legitimate governmental interest but is designed solely to further the Anticompetitive Plan to favor the Predatory Companies and make it impossible for anyone to challenge their monopoly or near monopoly position.

111.   The creation of these illegitimate financial barriers has had the desired effect of barring anyone other than the major outdoor advertising companies and

developers, including the Predatory Companies, from operating Billboards.[13] This action by the City has:

> a. Furthered the Anticompetitive Plan;
>
> b. Enabled the Predatory Companies to quash competition and maintain their monopolistic market share;
>
> c. Allowed the Predatory Companies to keep land rents artificially low;
>
> d. Permitted the Predatory Companies to keep ad rates artificially high;
>
> e. Ensured that Billboards remain almost entirely in the hands of those outdoor advertising companies, including the Predatory Companies, which have a vested interest in self-censorship to avoid offending the City Council;[14] and

---

[13] It would be as if the City had a favorite newspaper and sought to protect its exclusive rights by requiring anyone else wishing to establish a competing publication not to buy printing presses and pay for a business license but instead to construct a ten story building and donate a park. Such unrelated and artificial barriers to entry would serve no legitimate state interest but operate to impermissibly prevent the free exercise of First Amendment rights and preserve a monopoly for a favored speaker.

[14] The United States Supreme Court has repeatedly expressed concern over the tendency of speakers to engage in self-censorship when subjected to the unbridled discretion of government officials to allow or deny the right to speak:

> Self-censorship is immune to an "as applied" challenge, for it derives from the individual's own actions, not an abuse of government power. It is not difficult to visualize a newspaper that relies to a substantial degree on single issue sales feeling significant pressure to endorse the incumbent mayor in an upcoming election, or to refrain from criticizing him, in order to receive a favorable and speedy disposition on its permit application. **Only standards limiting the licensor's discretion will eliminate this danger by adding an element of certainty fatal to self-censorship.** Cf. *Hoffman Estates* v. *Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 498, 71 L. Ed. 2d 362, 102 S. Ct. 1186 (1982) (vagueness doctrine). And only a facial challenge can effectively test the statute for these standards. [Emphasis added.]

(*Lakewood v. Plain Dealer Pub. Co.* (1988) 486 U.S. 750, 757-758 [108 S.Ct. 2138, 2144, 100 L.Ed.2d 771, 783].)

The courts have also held that the existence of unbridled discretion makes it impossible to determine whether decisions by the licensing authority are content based and unconstitutional. (*Preferred Communications, Inc. v. Los Angeles* (9th Cir. 1985) 754 F.2d 1396, 1406.) In the instant case, the City has created a situation where building inspectors are called upon to decide whether a given message is permissible without any objective criteria to allow meaningful judicial review of their decisions.

**COMPLAINT**

f. Destroyed an entire medium of communication without leaving ample alternative means of communication in violation of the First Amendment. (*Frisby v. Schultz* (1988) 487 U.S. 474, 481, 108 S.Ct. 2495, 2500-2501, 101 L.Ed.2d 420, 429.)

112.   The United States Supreme Court has held that a law restricting speech is constitutionally invalid under the First Amendment if it destroys a medium of communication without leaving sufficient alternate channels. (*Virginia State Bd. of Pharmacy v. Virginia Citizens Consumer Council* (1976) 425 U.S. 748, 771 [96 S.Ct. 1817, 1830, 48 L.Ed.2d 346, 363-364].)

113.   The Court has further acknowledged the unconstitutionality of singling out a medium of communication for imposition of unique financial burdens such as special taxes not applicable to other businesses. (See, e. g., *Minneapolis Star & Tribune Co. v. Minn. Comm'r of Revenue* (1983) 460 U.S. 575, 585, 103 S.Ct. 1365, 1371-1372, 75 L.Ed.2d 295, 304-305.) Plaintiffs are informed and believe and thereon allege that each of the discretionary exemptions from the Sign Ban imposes financial burdens on would be speakers that are unrelated to Billboards and which are not of general application to all businesses and taxpayers.

## III. CAUSES OF ACTION

### FIRST CAUSE OF ACTION

(Deprivation of Civil Rights Against All Defendants – First Amendment)

114.   Plaintiffs refer to and incorporate herein by reference as through fully set forth paragraphs 1 through 113 of this Complaint.

115.   An actual and justiciable controversy has arisen and now exists between Plaintiffs and Defendants concerning the constitutionality of the City's Sign Ordinance and Sign Ban.

**COMPLAINT**

116.   Plaintiffs contend that the Sign Ordinance and Sign Ban are unconstitutional on their face and as applied because they abridge rights secured by the First and Fourteenth Amendments to the United States Constitution and Article I, Sections 2 and 7, of the California Constitution as described in detail above.

117.   Plaintiffs are informed and believe and thereon allege that Defendants dispute these contentions.

118.   Plaintiffs desire a judicial determination of the rights, duties and obligations of the parties concerning the Sign Ordinance and Sign Ban and specifically a declaration that they are unconstitutional facially and as applied under the First Amendment of the United States Constitution and Article I, Sections 2 and 7, of the California Constitution.

119.   A judicial declaration is necessary and appropriate at this time in order that Plaintiffs and Defendants may ascertain their rights, duties and obligations with respect to the Sign Ordinance and Sign Ban.

120.   Plaintiffs are also informed and believe and thereon allege that, unless and until restrained by this court, Defendants will continue to enforce and threaten to enforce the Sign Ordinance and the Sign Ban against Plaintiffs and continue to deprive Plaintiffs of civil rights secured by the United States and California Constitutions.

121.   If Defendants are allowed to continue to do so, Plaintiffs will be irreparably injured in that they will be deprived of constitutional rights guaranteed under the Federal and State Constitutions, will suffer substantial loss of rents, profits and goodwill, the nature and extent of which will be extremely difficult or impossible to ascertain, and will be subjected to a multiplicity of suits.  Permitting Defendants to continue to enforce the Sign Ordinance and Sign Ban will also have a chilling effect on the exercise of First Amendment rights by Plaintiff and members of the public.

**COMPLAINT**

122.   In engaging in the acts alleged above, Defendants have deprived Plaintiffs of rights, privileges and immunities secured by the Constitution of the United States, specifically, the right to freedom of speech, due process and equal protection of the laws as secured by the First, Fifth and Fourteenth Amendments to the United States Constitution. Such actions by Defendants, and each of them, have furthermore deprived Plaintiffs of rights, privileges and immunities secured by the Constitution of the State of California, specifically Article I §§ 2, 7 and 19.

123.   In performing these acts, Defendants have acted and conspired to act under color of statute, ordinance, regulation and policy of the City, which are outside their constitutional authority and contrary to law.

124.   As a direct and proximate result of the aforementioned conduct of Defendants, and each of them, Plaintiffs have been and are being deprived and threatened with the deprivation of rents, profits and goodwill from Billboards and ground leases as described in detail above and has therefore been damaged in an amount according to proof at trial.

125.   Plaintiffs have no adequate remedy at law to prevent or redress this irreparable injury.

126.   If Plaintiffs are successful in this action they are entitled to recover reasonable attorneys' fee pursuant to 42 USC § 1988. Additionally, a victory for Plaintiffs will confer a significant benefit on the general public or a large class of people, and Plaintiffs are entitled to an award of attorneys' fees pursuant to Code of Civil Procedure section 1021.5.

## SECOND CAUSE OF ACTION

(Deprivation of Civil Rights Against All Defendants – Fifth Amendment)

127.   Plaintiffs refer to and incorporate herein by reference as through fully set forth paragraphs 1 through 126 of this Complaint.

**COMPLAINT**

128.   An actual and justiciable controversy has arisen and now exists between Plaintiffs and Defendants concerning the constitutionality of the Sign Ordinance and Sign Ban.

129.   Plaintiffs contend that the Sign Ordinance and Sign Ban are unconstitutional facially and as applied because they abridge rights secured by the Fifth Amendment to the United States Constitution and Article I, Section 19, of the California Constitution as described in detail above.

130.   Plaintiffs are informed and believe and thereon alleges that Defendants dispute these contentions.

131.   Plaintiffs desire a judicial determination of the rights, duties and obligations of the parties concerning the Sign Ordinance and Sign Ban and specifically a declaration that they are unconstitutional facially and as applied under the Fifth Amendment to the United States Constitution and Article I, Section 19, of the California Constitution

132.   A judicial declaration is necessary and appropriate at this time in order that Plaintiffs and Defendants may ascertain their rights, duties and obligations with respect to the Sign Ordinance and Sign Ban.

133.   Plaintiffs are also informed and believe and thereon allege that, unless and until restrained by this court, Defendants will continue to enforce and threaten to enforce the Sign Ordinance and the Sign Ban against Plaintiffs and continue to deprive Plaintiffs of civil rights secured by the United States and California Constitutions.

134.   If Defendants are allowed to continue to do so, Plaintiffs will be irreparably injured in that they will be deprived of constitutional rights guaranteed under the Federal and State Constitutions, will suffer substantial loss of rents, profits and goodwill, the nature and extent of which will be extremely difficult or impossible to ascertain, and will be subjected to a multiplicity of suits.  Permitting

COMPLAINT

Defendants to continue to enforce the Sign Ordinance and Sign Ban will also have a chilling effect on the exercise of First Amendment rights by Plaintiff and members of the public.

135.   In engaging in the acts alleged above, Defendants have deprived Plaintiffs of rights, privileges and immunities secured by the Constitution of the United States, specifically, the right to freedom of speech, due process and equal protection of the laws as secured by the First, Fifth and Fourteenth Amendments to the United States Constitution. Such actions by Defendants, and each of them, have furthermore deprived Plaintiffs of rights, privileges and immunities secured by the Constitution of the State of California, specifically Article I §§ 2, 7 and 19.

136.   In performing these acts, Defendants have acted and conspired to act under color of statute, ordinance, regulation and policy of the City, which are outside their constitutional authority and contrary to law.

137.   As a direct and proximate result of the aforementioned conduct of Defendants, and each of them, Plaintiffs have been and are being deprived and threatened with the deprivation of rents, profits and goodwill from Billboards and ground leases as described in detail above and has therefore been damaged in an amount according to proof at trial.

138.   Plaintiffs have no adequate remedy at law to prevent or redress this irreparable injury.

139.   If Plaintiffs are successful in this action they are entitled to recover reasonable attorneys' fee pursuant to 42 USC § 1988. Additionally, a victory for Plaintiffs will confer a significant benefit on the general public or a large class of people, and Plaintiffs are entitled to an award of attorneys' fees pursuant to Code of Civil Procedure section 1021.5.

**COMPLAINT**

## **THIRD CLAIM FOR RELIEF**

(Inverse Condemnation Against the City of Los Angeles)

140.   Plaintiffs refer to and incorporates herein by reference as though fully set forth paragraphs 1 through 139 of this Complaint.

141.   The Constitutions of the United States and the State of California guarantee that private property shall not be taken by a public entity without just compensation.

142.   Condemnation is the legal process by which a public entity exercises its right of eminent domain. Inverse condemnation is a cause of action against a public entity to recover the true value of property which has been taken in fact by the public entity, even though no formal exercise of the power of eminent domain has been attempted.

143.   As a direct and proximate result of the enactment and enforcement of the Sign ordinance and the Sign Ban and the City's actions in furthering the Anticompetitive Plan, including, but not limited to its issuance of demolition permits without property owner concert and willingness to allow the "relocation" of demolished Billboards without compensation to property owners, it has destroyed the value of thousands of parcels of real property owned by Plaintiffs, including, but not limited to CALPRO and its members.

144.    The City's acts constituted a taking and appropriation of private property without payment of just compensation in violation of the Constitutions of the United States and the State of California.

145.   An actual and justiciable controversy has arisen and now exists between Plaintiffs and the City concerning the constitutionality of its actions as described above, including its uncompensated taking of Plaintiffs' property and actions to further the Anticompetitive Plan.

**COMPLAINT**

146.   Plaintiffs contend that the City's actions are unconstitutional because they abridge rights secured by the Fifth Amendment to the United States Constitution and Article I, Section 19, of the California Constitution as described in detail above.

147.   Plaintiffs are informed and believe and thereon alleges that Defendants dispute these contentions.

148.   Plaintiffs desire a judicial determination of the rights, duties and obligations of the parties concerning the Sign Ordinance and Sign Ban and specifically a declaration that they are unconstitutional facially and as applied under the Fifth Amendment to the United States Constitution and Article I, Section 19, of the California Constitution

149.   A judicial declaration is necessary and appropriate at this time in order that Plaintiffs and Defendants may ascertain their rights, duties and obligations with respect to the Sign Ordinance and Sign Ban.

150.   Plaintiffs are also informed and believe and thereon allege that, unless and until restrained by this court, Defendants will continue to enforce and threaten to enforce the Sign Ordinance and the Sign Ban and continue to further the Anticompetitive Plan against Plaintiffs and continue to deprive Plaintiffs of civil rights secured by the United States and California Constitutions.

151.   If Defendants are allowed to continue to do so, Plaintiffs will be irreparably injured in that they will be deprived of constitutional rights guaranteed under the Federal and State Constitutions, will suffer substantial loss of rents, profits and goodwill, the nature and extent of which will be extremely difficult or impossible to ascertain, and will be subjected to a multiplicity of suits.

152.   As a direct and proximate result of the aforementioned conduct of Defendants, and each of them, Plaintiffs have been and are being deprived and threatened with the deprivation of rents, profits and goodwill from Billboards and

**COMPLAINT**

ground leases as described in detail above and has therefore been damaged in an amount according to proof at trial.

153.   Plaintiffs have no adequate remedy at law to prevent or redress this irreparable injury.

154.   If Plaintiffs are successful in this action a significant benefit will be conferred on the general public or a large class of people, and Plaintiffs are entitled to an award of attorneys' fees pursuant to Code of Civil Procedure section 1021.5.

## **FOURTH CLAIM FOR RELIEF**

(Violation of Sherman Antitrust Act Against All Defendants

Except the City of Los Angles)

155.   Plaintiffs refer to and incorporates herein by reference as though fully set forth paragraphs 1 through 154 of this Complaint.

156.   As described in greater detail above, the Predatory Companies entered into the Anticompetitive Plan, a conspiracy to monopolize and control the outdoor adverting market in Los Angeles, including but not limited to keeping ad rates artificially high and land rents artificially low.

157.   Plaintiffs are informed and believe and thereon allege that the Anticompetitive Plan violates the Sherman Antitrust Act (15 U.S.C. §§ 1 and 2) by allowing the Predatory Companies not only to fix prices for advertising and for ground leases but also to divide the Los Angeles outdoor advertising market among themselves and keep out competitors.

158.   Plaintiffs are further informed and believe and thereon allege that the Anticompetitive Plan and the conduct described above also violates the Sherman Antitrust Act under a "rule of reason" analysis, because it amounts to an unreasonable restraint of trade. Such restraint of trade includes, but is not limited to: a. preventing local property owners from realizing fair market value for ground

**COMPLAINT**

leases; b. keeping other smaller outdoor adverting companies from entering the Los Angeles market; and c. artificially inflating adverting rates.

159.   Because the Predatory Companies generally operate Billboards across the United States and most of the adverting carried on their Billboards is for national brands and products, the Anticompetitive Plan has had an impact on commerce in California and throughout the United States. Plaintiffs are further informed and believes and thereon alleges that the Predatory Companies employ near identical anticompetitive tactic is most or all of the jurisdictions in which they operate across the United States, having a significant impact on interstate commerce.

160.   Plaintiffs have been injured in their business and property as a result of the illegal conduct of the Predatory Companies, including the Anticompetitive Plan, for which they seek damages in an amount to be determined at trial, including treble damages and prejudgment interest.

161.   Plaintiffs are informed and believe and thereon allege that the wrongful conduct of the Predatory Companies will continue unless enjoined and restrained by the court.

162.   Plaintiffs have no adequate remedy at law to prevent or redress this irreparable injury.

163.   Plaintiffs are entitled to reasonable attorney's fees and court costs pursuant to the Sherman Antitrust Act. Additionally, a victory for Plaintiffs will confer a significant benefit on the general public or a large class of people, and Plaintiffs are entitled to an award of attorneys' fees pursuant to Code of Civil Procedure section 1021.5.

**COMPLAINT**

## FIFTH CLAIM FOR RELIEF

(Violation of Cartwright Act Against All Defendants

Except the City of Los Angles)

164.   Plaintiffs refer to and incorporate herein by reference as though fully set forth paragraphs 1 through 163 of this Complaint.

165.   As described in greater detail above, the Predatory Companies entered into the Anticompetitive Plan, a conspiracy to monopolize and control the outdoor adverting market in Los Angeles, including but not limited to keeping ad rates artificially high and land rents artificially low.

166.   Plaintiffs are informed and believe and thereon allege that the Anticompetitive Plan has allowed the Predatory Companies to unlawfully fix prices and to divide the Los Angeles outdoor advertising market among themselves and keep out competitors.

167.   Plaintiffs are further informed and believe and thereon alleges that the Anticompetitive Plan constitutes an unreasonable restraint of trade or commerce throughout California and the rest of the United States in violation of the Cartwright Act. (Business and Professions Code sections 16700-16770.)

168.   Plaintiffs have been injured in their business and property as a result of the illegal conduct of the Predatory Companies for which it seeks damages in an amount to be determined at trial, including treble damages and prejudgment interest.

169.   Plaintiffs are informed and believe and thereon allege that the wrongful conduct of the Predatory Companies, and each of them, will continue unless enjoined and retained by the court.

170.   Plaintiffs have no adequate remedy at law to prevent or redress this irreparable injury.

171.   If Plaintiffs prevail in this action, they will be entitled to recover their attorneys' fees under the Cartwright Act. Additionally, a victory for Plaintiffs will

**COMPLAINT**

confer a significant benefit on the general public or a large class of people, and Plaintiffs are also entitled to an award of attorneys' fees pursuant to Code of Civil Procedure section 1021.5.

## SIXTH CLAIM FOR RELIEF

(Violation of California Unfair Competition Law Against All Defendants Except the City of Los Angeles)

172.   Plaintiffs refer to and incorporate herein by reference as though fully set forth paragraphs 1 through 171 of this Complaint.

173.   The Anticompetitive Plan and other wrongful conduct described in detail above constitutes unlawful, fraudulent and unfair business acts and practices within the meaning of the California Unfair Competition Law, Business and Professions Code section 17200, et seq (the "UCL"). Such conduct is in part unlawful, fraudulent and unfair because it violates, inter alia, the United States and California Constitutions and the Sherman Antitrust Act and the Cartwright Act.

174.   Plaintiffs are further informed and believe and thereon allege that such conduct by Defendants is representative of their business practices not only in Los Angeles but in other municipalities throughout the country, in that they regularly take unlawful, fraudulent or unfair steps to prevent local property owners from obtaining fair market value for ground leases and to stifle all competition to keep ad rates artificially high.

175.   Plaintiffs have suffered injury in fact and lost money and property as a result the violations of law and other wrongful conduct of the Predatory Companies. As a result of such conduct by the Predatory Companies, they have wrongfully obtained ground lease rental income which rightfully belongs to Plaintiffs in an amount according to proof at trial. As a result, Plaintiffs are entitled to restitution of all such amounts wrongfully obtained by the Predatory Companies.

**COMPLAINT**

176.   Unless and until enjoined and restrained by order of this Court, the wrongful conduct of the Predatory Companies, as described above, will cause great and irreparable injury to Plaintiffs. Furthermore, Plaintiffs will be deprived of civil rights guaranteed by the United States and California Constitutions.[15]

177.   '"Under the UCL, any person or entity that has engaged, is engaging or threatens to engage "in unfair competition may be enjoined in any court of competent jurisdiction." (Bus. & Prof. Code, §§ 17201, 17203.) "Unfair competition" includes "any unlawful, unfair or fraudulent business act or practice…."' (Bus. & Prof. Code, § 17200.) *Jenkins v. JPMorgan Chase Bank, N.A.* (Cal. App. 4th Dist. 2013), 216 Cal. App. 4th 497, 520.

178.   Plaintiffs have no adequate remedy at law for the injuries currently being suffered in that it will be difficult for Plaintiff to determine the precise amount of damage which it will suffer if Defendants' conduct is not restrained.

179.   If Plaintiffs prevail in the action, a significant benefit will be conferred on the general public or a large class of people, and Plaintiffs are entitled to an award of attorneys' fees pursuant to Code of Civil Procedure section 1021.5.

## **SEVENTH CLAIM FOR RELIEF**

(Writ of Mandate Against the City of Los Angeles)

180.   Plaintiffs refer to and incorporate herein by reference as though fully set forth paragraphs 1 through 179 of this Complaint.

181.   As described above, the LAMC prohibits the issuance of permits by the Department of Building and Safety without consent by the property owner of record. However, in the case of Billboards, City employees are issuing such permits

---

[15] When a violation of constitutionally protected rights is shown irreparable injury is presumed. *Mitchell v. Cuomo* (2nd Cir. 1984) *748 F.2d 804, 806.* Furthermore, the presumption of irreparable injury is particularly strong in cases involving infringement on First Amendment rights. (*Elrod v. Burns* (1976) 427 U.S. 347, 96 S.Ct. 2673, 49 L.Ed.2d 547.)

COMPLAINT

without the knowledge and consent of the owner of the real property.

182.   In connection with the First Karraa Billboard, the City issued a permit to allow Outfront to dismantle portions of the First Karraa Billboard, though they were made aware that the owner of record of the Service Station Property had not consented.

183.   As further described above, the LAMC provides that legal, non-conforming Billboards may be altered, repaired or rehabilitated so long as the cost of the work does not exceed 50 percent of the replacement cost of both the sign and sign support structure and there is no increase in height or size.

184.   VMG and Stephens caused to be submitted to the City on behalf of Karraa an application to alter, repair or rehabilitate the First Karraa Billboard by replacing the above ground portions that had been dismantled by Outfront.

185.   The cost of the work for which VMG and Stephens sought a permit was less than "50 percent of the replacement cost of both the sign and sign support structure" and the application did not seek to change its permitted size and height.

186.   Though VMG and Stephens were entitled to a permit pursuant to LAMC section  91.6216.4., the application was wrongfully denied.

187.   This denial was a violation of the mandatory duty of City employees to issue building permits that are in full compliance with the LAMC, which does not allow City employees to enforce its provisions in an unequal or selective manner.

188.   The foregoing conduct of Defendants, an each of them, constitutes a gross abuse of authority and breach of a mandatory duty which operates to damage Plaintiffs, including Karraa, Stephens and VMG. Said failure and refusal is furthermore arbitrary, capricious and contrary to law.

189.   Plaintiffs are entitled to a preemptory Writ of Mandate commanding the City to cease violating mandatory duties and obligations under the LAMC by issuing permits relation to Billboards without proof of consent by the property owner

of record. Such Writ should include but not be limited to the Second Karraa Billboard.

190. Plaintiffs are furthermore entitled to a preemptory Writ of Mandate commanding the City to cease violating mandatory duties and obligations under the LAMC and issue a permit under LAMC section 91.6216.4. to allow "Alterations, Repairs or Rehabilitation" of the First Karraa Billboard so long as the work does not exceed "50 percent of the replacement cost of both the sign and sign support structure."

191. Plaintiffs have no other plain, speedy and adequate remedy in the ordinary course of law.

## IV. PRAYER

WHEREFORE, Plaintiffs pray for judgment as follows:

## FIRST CLAIM FOR RELIEF

1.    For a judicial declaration and decree that the Sign Ordinance and Sign Ban are unconstitutional facially and as applied to Plaintiffs because they violate rights secured by the First, Fifth and Fourteenth Amendments to the United States Constitution and Article I, Sections 2 and 7, of the California Constitution.

2.    For a preliminary and permanent injunction restraining Defendants and their agents, employees, representatives, successors, and all persons acting in concert with them, or any of them, from: a. enforcing the provisions of the City's Sign Ordinance and Sign Ban; b. issuing any permits relating to construction or demolition of any Billboard without property owner consent; c. from improperly using its Police Power to condition the construction of any Billboard on an applicant providing money, property or other resources to the City having no reasonable nexus to any alleged public burden allegedly caused by such Billboard

**COMPLAINT**

d. from interfering with or attempting to interfere with Plaintiffs' use and enjoyment of their Billboards.

3.     For general damages in an amount according to proof at trial.

4.     For reasonable attorneys' fees pursuant to 42 USC § 1988 and Code of Civil Procedure section 1021.5.

## SECOND CLAIM FOR RELIEF

1.     For a judicial declaration and decree that the Sign Ordinance and Sign Ban are unconstitutional facially and as applied to Plaintiffs because they violate rights secured by the Fifth Amendment to the United States Constitution and Article I, Section 19, of the California Constitution.

2.     For a judicial declaration and decree that permits for Billboards that have become legal, nonconforming uses of property belong wholly or partially to the owner of the real property to which they relate and cannot be unilaterally canceled without property owner consent and government compensation.

3.     For a preliminary and permanent injunction restraining Defendants and their agents, employees, representatives, successors, and all persons acting in concert with them, or any of them, from: a. enforcing the provisions of the City's Sign Ordinance and Sign Ban; b. issuing any permits relating to construction or demolition of any Billboard without property owner consent; c. from improperly using its Police Power to condition the construction of any Billboard on an applicant providing money, property or other resources to the City having no reasonable nexus to any alleged public burden allegedly caused by such Billboard d. from interfering with or attempting to interfere with Plaintiffs' use and enjoyment of their Billboards.

4.     For general damages in an amount according to proof at trial.

**COMPLAINT**

5.      For reasonable attorneys' fees pursuant to 42 USC § 1988 and Code of Civil Procedure section 1021.5.

### THIRD CLAIM FOR RELIEF

1.      For a judicial declaration and decree that permits for Billboards that have become legal, nonconforming uses of property belong wholly or partially to the owner of the real property to which they relate and cannot be unilaterally canceled without property owner consent and government compensation.

2.      For a preliminary and permanent injunction restraining Defendants and their agents, employees, representatives, successors, and all persons acting in concert with them, or any of them, from: a. enforcing the provisions of the City's Sign Ordinance and Sign Ban; b. issuing any permits relating to construction or demolition of any Billboard without property owner consent; c. from improperly using its Police Power to condition the construction of any Billboard on an applicant providing money, property or other resources to the City having no reasonable nexus to any alleged public burden allegedly caused by such Billboard d. from interfering with or attempting to interfere with Plaintiffs' use and enjoyment of their Billboards.

3.      For general damages in an amount according to proof at trial.

4.      For reasonable attorneys' fees pursuant to Code of Civil Procedure section 1021.5.

### FOURTH CLAIM FOR RELIEF

1.      For general damages in an amount according to proof at trial.

2.      For treble damages.

3.      For reasonable attorneys' fees pursuant to the Sherman Antitrust Act and Code of Civil Procedure section 1021.5.

**COMPLAINT**

## FIFTH CLAIM FOR RELIEF

1.     For general damages in an amount according to proof at trial.

2.     For treble damages.

3.     For reasonable attorneys' fees pursuant to the Cartwright Act and Code of Civil Procedure section 1021.5.

## SIXTH CLAIM FOR RELIEF

1.     For an injunction restraining Defendants and their agents, officers and employees, and all persons acting in concert with them, from continuing to implement the Anticompetitive plan, including, but not limited to: a. suppressing ground lease rents below fair market value; b. artificially inflating ad rates; c. demolishing legal, nonconforming Billboards; d. committing waste on sites they lease for Billboards by demolishing legal, nonconforming structure without property consent; and e. threatening to demolish legal, nonconforming Billboards as a means of forcing property owners to accept less than fair market rent and prevent competition from other outdoor advertising companies.

2.     Restitution to Plaintiffs of all monies that Defendants avoided paying in ground lease rent by their unfair, illegal and fraudulent efforts to depress such rents below actual fair market value.

3.     For an award of reasonable attorneys' fees pursuant to Code of Civil Procedure section 1021.5.

## SEVENTH CLAIM FOR RELIEF

1.     That the Court issue a preemptory Writ of Mandate commanding the CITY to cease violating mandatory duties and obligations under the LAMC and the Sign Ordinance and:

A. Cease issuing any permits relating to Billboards without proof of consent by the owner of record of the real property to which the permit relates.

**COMPLAINT**

B. Issue a permit under LAMC section 91.6216.4. to allow "Alterations, Repairs or Rehabilitation" of the First Karraa Billboard so long as the work does not exceed "50 percent of the replacement cost of both the sign and sign support structure."

## **ON ALL CLAIMS FOR RELIEF**

1.     For costs of suit herein; and

2.     For such other and further relief as the court may deem just and proper.


Dated: April 24, 2020

_____

By: Raymond N. Haynes, Jr.
California State Senate, 1994-2002
California State Assembly, 1992-94, 2002-06

Attorneys for Plaintiffs
CALPRO, ANTON KARRAA
RABADI SERVICE STATION, INC.,
J. KEITH STEPHENS, AND
VIRTUAL MEDIA GROUP, INC.

# **DEMAND FOR JURY TRIAL**

TO DEFENDANTS:

     PLEASE TAKE NOTICE that Plaintiffs hereby demand a jury trial in this action.

Dated: April 24, 2020

 

_____
By: Raymond N. Haynes, Jr.
California State Senate, 1994-2002
California State Assembly, 1992-94, 2002-06

Attorneys for Plaintiffs
CALPRO, ANTON KARRAA
RABADI SERVICE STATION, INC.,
J. KEITH STEPHENS, AND
VIRTUAL MEDIA GROUP, INC.

**COMPLAINT**